1

2

3

4

5

6                              UNITED STATES DISTRICT COURT

7                                    DISTRICT OF NEVADA

8                                             * * *

9

10   UNITED STATES OF AMERICA,            )
                                          )
11            Plaintiff,                   )              2:08-cr-00353-RLH-RJJ
                                          )
12   vs.                                   )          REPORT &   RECOMMENDATION
                                          )             OF UNITED STATES
13                                         )            MAGISTRATE JUDGE
                                          )          _____
14   PEDRO JOSE GARCIA,                    )          (Defendant's Motion to Suppress #13)
                                          )
15   _____Defendant._____)

16            This matter came before the court for a hearing on Defendant Pedro Jose Garcia's Motion

17   to Suppress (#13).  The Court has considered the Defendant's Motion to Suppress (#13) and the

18   Government's Response (#15), as well as the testimony and evidence presented at the evidentiary

19   hearing.

20                                      **BACKGROUND**

21            On December 23, 2008, a federal grand jury indicted Pedro Jose Garcia charging him with

22   being a felon unlawfully in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and

23   924(a)(2).  The Government also seeks forfeiture of certain property from Garcia pursuant to 18

24   U.S.C. § 922(d)(1).

25            On August 29, 2007, Las Vegas Metropolitan Department Officer James Sutton was

26   patrolling the area near the intersection of Charleston and Mojave in Las Vegas, Nevada.  Officer

27   Sutton was alone, uniformed, and traveling in a marked patrol unit.  At approximately 3:13 a.m.,

28   Officer Sutton observed a white Buick exit from a 7-Eleven parking lot and enter the westbound

     traffic lane of Charleston.  The vehicle was operated without illuminated headlights or taillights.

1   Officer Sutton followed the suspect vehicle for approximately a half block before activating his

2   patrol vehicle's rooftop lights and initiating a traffic stop.

3          In response, Garcia pulled into an apartment complex parking lot. Officer Sutton approached

4   the vehicle and asked to see Garcia's driver's license, registration and proof of insurance. Garcia

5   was unable to produce any of the requested documents. Pursuant to Las Vegas Metropolitan Police

6   Department (LVMPD) policy, Officer Sutton asked Garcia to verbally identify himself and made a

7   general inquiry into Garcia's failure to activate his lights prior to entering the roadway. During this

8   exchange, Officer Sutton observed a clear baggy containing what appeared to be a crystalline

9   substance in the vehicle's center console. Officer Sutton suspected the baggy contained a possible

10  controlled substance–methamphetamine. He did not disclose his suspicions to Garcia.

11         After obtaining verbal identification and seeing the baggy that possibly contained

12  methamphetamine, Officer Sutton returned to his patrol car to confirm Garcia's identity by running

13  the name through various databases. This confirmed Garcia's identity and revealed his criminal

14  history, including a felony conviction. Officer Sutton returned to the vehicle and asked Garcia

15  whether there was anything illegal in the vehicle. Garcia said no. A written consent to search form

16  was not used, although Officer Sutton had blank consent to search forms in his vehicle. Officer

17  Sutton then asked for consent to "look" in the vehicle–which Garcia granted. Before removing

18  Garcia from the vehicle, Officer Sutton, pursuant to LVMPD procedures, requested the presence of

19  another unit. Officer Sutton's request for another unit occurred at approximately 3:21:21 a.m. All

20  of these events occurred less than eight (8) minutes after the initial stop.

21         Within minutes of Officer Sutton's request for backup, LVMPD Officer Shane Black arrived

22  on the scene. When Officer Black arrived, Garcia was still in his vehicle. With Officer Black now

23  at the scene, Officer Sutton removed Garcia from the vehicle, escorted Garcia to the front of the

24  patrol car, and positioned Garcia with his back to his Buick. Officer Black remained with Garcia

25  while Officer Sutton returned to search the vehicle.

26         Officer Sutton commenced the search by opening the driver's side door of Garcia's vehicle

27  whereupon he observed expended shell casings on the driver's side floorboard. Officer Sutton

28  continued the search and discovered two more spent shell casings underneath the floor mat, as well

1   as a loaded Cobra Patriot .380 caliber handgun underneath the driver's seat.  Upon finding the

2   handgun, Officer Sutton alerted Officer Black that he had discovered a firearm.  Officer Sutton

3   returned to Garcia, put him in handcuffs, placed him under arrest, and allegedly gave Garcia the

4   *Miranda* warnings.  Officer Black was standing within a few feet of Garcia when he was handcuffed

5   and arrested by Officer Sutton.  The record contains NO written <u>Miranda</u> waiver and, despite being

6   no more than 10-15 feet from the suspect, Officer Black testified that he did not hear Officer Sutton

7   give the *Miranda* warnings.[1]

8          After placing Garcia under arrest, Officer Sutton returned to Garcia's vehicle and retrieved

9   the handgun, as well as, the plastic baggy containing the crystalline substance.  At 3:32:16 a.m.,

10   Officer Black rendered the firearm safe.  Ex. 4.  Once the items were retrieved from the vehicle,

11   Officer Sutton questioned Garcia.  Garcia responded with several incriminating statements.  At some

12   point during the questioning, Officer Danielle Sigmund  arrived on the scene and Officer Black

13   began to walk back and forth between her and Officer Sutton.[2]  At no time was Officer Black more

14   than 15-20 feet from the suspect.  Unlike the *Miranda* warnings, Officer Black was able to ascertain

15   "bits and pieces" of the suspects incriminating statements including the statements regarding the

16   firearm.

17          Garcia asks this court to suppress all the evidence recovered during Officer Sutton's search,

18   particularly the firearm and ammunition, and all the statements made after Garcia was arrested.

19   Garcia argues that suppression is warranted because (1) the scope of the traffic stop and length of

20   the detention was unreasonably prolonged without reasonable suspicion; (2) Garcia's consent to

21   search was the product of coercion or, alternatively, tainted by the initial illegal investigation; and

22   (3) Garcia's statements to the police after he was arrested were taken in violation of *Miranda*.

23   . . . .

24   . . . .

25   ———————

26   [1]  Officer Black testified that he was an arms length away from the suspect when he was put in handcuffs and placed under arrest.  He further testified that once the suspect was arrested, he was never more

27   than 10-15 feet from the suspect and Officer Sutton.

28   [2]  Officer Sigmund was present to assist in the testing and identification of the crystalline substance found in Garcia's vehicle.  Her field test confirmed that the substance was methamphetamine.

**DISCUSSION**

**1. The Fourth Amendment**

    **A.  The Initial Stop**

      The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated."[3]  U.S. CONST. AMEND. IV.  It is well settled that a vehicle stop by the police is a seizure within the meaning of the Fourth Amendment,  *United States v. Garcia*, 205 F.3d 1182, 1186 (9th Cir. 2000) (*citing Delaware v. Prouse*, 440 U.S. 648, 653 (1979)), and is subject to the constitutional requirement that it be reasonable.  *Prouse*, 440 U.S. at 653-54.  The decision to stop a vehicle is reasonable when there is probable cause to believe a traffic violation occurred.  *Whren v. United States*, 517 U.S. 806, 810 (1996).  Here, there is no dispute that the traffic stop was justified at its inception.  Garcia was traveling along a public roadway without his lights on in violation of Nevada Revised Statute (NRS) 484.545.

    **B.  Prolonged Detention**

      The gravamen of the Fourth Amendment dispute centers around the circumstances of the traffic stop.  First, Garcia contends that the scope of the detention was not appropriately tailored to its initial justification which, in turn, unlawfully prolonged the detention.  The Government argues that the length and scope of the initial investigation was appropriately tailored to the investigation of the traffic infraction and appropriately broadened as indicia of additional criminal activity became known to the investigating officer.

      A traffic stop is an investigative detention and, therefore, a seizure within the meaning of the Fourth Amendment.  *United States v. Sharpe*, 470 U.S. 675, 682 (1985). There is no definitive rule on the time limit for a lawful investigative detention. *United States v. Torres-Sanchez*, 83 F.3d 1123, 1128 (9th Cir. 1996) (citation omitted).  Rather, courts undertake a fact-specific inquiry, based on the totality of the circumstances, to determine whether the detention is reasonable.  *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996).  Law enforcement officers are not required to move at top speed

---

[3]  The Government does not dispute that Garcia, as the driver of the vehicle, has standing to pursue all of the Fourth Amendment claims raised.

1   when executing a traffic stop.  *United States v. Turvin*, 517 F.3d 1097, 1102 (9th Cir. 2008).  "The

2   critical inquiry is whether the officers 'diligently pursued a means of investigation that was likely

3   to confirm or dispel their suspicions quickly, during which time it was necessary to detain the

4   defendant.'"  *Sharpe*, 470 U.S. at 686.

5       Here, Officer Sutton lawfully pulled over a vehicle that was being driven at night without

6   lights.  He approached the vehicle and requested the driver provide a driver's license, proof of

7   insurance and proof of registration.  The driver was unable to produce any of the requested

8   documents.  Therefore, pursuant to LVMPD policy, Officer Sutton requested that the driver verbally

9   identify himself.  During the course of this exchange, Officer Sutton also saw a small plastic baggy

10  which appeared to contain a crystalline-like substance.  Consistent with his experience and training,

11  Officer Sutton testified that he immediately suspected the baggy contained methamphetamine.

12      After obtaining the suspect's name, Officer Sutton returned to his patrol vehicle to confirm

13  the suspect's identity.  Officer Sutton's search confirmed the suspect was Pedro Jose Garcia and

14  revealed his status as a convicted felon.  Having confirmed the suspect's identity, Officer Sutton

15  returned to Garcia's vehicle.  All of this occurred within eight (8) minutes of the initial traffic stop.

16  A records check is an expected and appropriate part of a traffic stop.  *See Berkemer v. McCarty*, 468

17  U.S. 420, 437 (1984) ("A motorist's expectations, when he sees a policeman's lights flashing behind

18  him, are that he will be obliged to spend a short period of time answering questions and waiting

19  while the officer checks his license and registration").  Accordingly, the court finds that the stop was

20  not unnecessarily prolonged due to the investigating officer's records check.

21      Garcia argues that Officer Sutton's request for consent to search the vehicle  unlawfully

22  prolonged the detention because it was not supported by reasonable suspicion.  In making this

23  argument, Garcia appears to rely on the Ninth Circuit opinion in *United States v. Chavez-Valenzuela*,

24  268 F.3d 719 (9th Cir. 2001) which held that, during a traffic stop, a police officer may only "ask

25  questions that are reasonably related in scope to the justification for his initiation of contact" and

26  may expand the scope of the questioning beyond the initial purpose only if he "articulate[s]

27  suspicious factors that are particularized and objective.  *Chavez-Valenzuela*, 268 F.3d at 724; *see*

28  *also United States v. Murillo*, 255 F.3d 1169, 1174.  The Ninth Circuit has expressly recognized the

underlying assumption of *Chavez-Valenzuela* that "*any* questioning unrelated to the purpose of the stop, regardless of its effect on the duration of the stop, need[s] to be supported by reasonable suspicion" is no longer good law, inasmuch as it has been overruled by *Muehler v. Mena*, 544 U.S. 93, 101 (2005) (holding that no reasonable suspicion is required to justify questioning that does not prolong the stop). *Turvin*, 517 F.3d at 1100; *see also United States v. Mendez*, 476 F.3d 1077, 1079-80 (9th Cir. 2007).

The facts in *Mendez* follow: the suspect was stopped because his car did not have a license plate or temporary registration tag. While one officer conducted a records check, a second officer waited at the curb with the suspect and asked him several questions unrelated to his license plate or vehicle registration.   Once the officer completed the records check, he started back toward the suspect to inform him that his temporary registration plate had expired; en route, he overheard the suspect telling the other officer that he was "trying to get away from the gang life" and that he had spent time in an Illinois prison.  As he approached the suspect, he asked the suspect why he had been imprisoned to which the suspect replied that he had been convicted of a weapons violation. The officer then asked whether he had any weapons in the car, and the suspect admitted having a firearm in the driver's door handle. The suspect was arrested.  A subsequent vehicle search revealed a loaded, small caliber, semi-automatic pistol. 476 F.3d at 1078-1079.

Mendez moved to suppress the handgun, arguing that the officers lacked reasonable suspicion to interrogate him about matters beyond the purpose of the stop. The court denied the motion.  On appeal, the Ninth Circuit also rejected the argument, relying on the Supreme Court's decision in *Muehler*, which held that "mere police questioning does not constitute a seizure" and thus no reasonable suspicion is required to justify questioning that does not prolong an initially lawful stop. *Mendez*, 476 F.3d. at 1080, *quoting Muehler* 544 U.S. at 101.

Here, like *Mendez*, Officer Sutton's request for consent to search the vehicle came during the course of a lawful traffic stop and did not unlawfully prolong the detention.  Further, based on the totality of the circumstances, the court finds that the officer had reasonable suspicion justifying an expansion of the scope of the detention.   Officer Sutton's testimony establishes that he had reasonable suspicion, based on articulable and particularized facts, to believe that there was an illegal

1    controlled substance in Garcia's vehicle.  He saw a clear baggy containing a crystalline like

2    substance which, based on his training and experience, resembled a baggy containing

3    methamphetamine.  Additionally, Garcia could not produce a valid driver's license or other

4    documents indicating ownership.  Under these circumstances, the request to search was justified.

5            **C. Garcia's Consent To Search**

6            Garcia does not dispute that he consented to the search.  Instead he argues that the

7    prosecution is unable to meet its "heavy burden" of demonstrating that the consent was freely and

8    voluntarily given.  *See United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997) (*citing*

9    *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).  According to Garcia, his consent was not

10   valid because (1) it was tainted by the illegal detention and (2) it was the product of duress and

11   coercion.  Based on the court's determination that the scope and length of the traffic stop was not

12   illegal, Garcia's first argument unpersuasive.  In response to Garcia's second argument, the

13   Government argues (1) that the consent to search was voluntary and (2) that regardless of whether

14   the consent to search was voluntary, because the investigating officer observed suspected narcotics

15   in plain view within the vehicle there was probable cause to conduct a warrantless search of the

16   vehicle under the "vehicle exception" to the Fourth Amendment.[4]  Because the court finds that the

17   investigating officer had probable cause to conduct a warrantless search it does not reach the issue

18   of whether the consent to search was voluntarily given.[5]

19           The Fourth Amendment generally requires law enforcement officials to obtain a warrant

20   before conducting a search. *California v. Carney*, 471 U.S. 386, 390-91 (1985).  Despite this general

21   requirement, the Supreme Court has carved out a number of exceptions, including the "automobile

22   exception" to the warrant requirement.  *See Carroll v United States*, 267 U.S. 132, 153 (1925).

23   Under established Supreme Court precedent, there is no separate exigency requirement necessary

24   to trigger the "automobile exception."  *Maryland v. Dyson*, 527 U.S. 465, 467 (1999).  The

25

26           [4]  The Government buries this argument in a footnote with little authority and limited analysis. *See* Govt's Response (#15) at fn. 3.

27           [5]   The Court does note that the totality of the circumstances indicates a high probability that if Garcia's consent provided the <u>sole</u> authority for the search, it would have been unconstitutional. *See United States v. McWeeney*, 454 F.3d 1030 (9th Cir. 2006).

28

- 7 -

1    "automobile exception" is triggered "[i]f a car is readily mobile and probable cause exists to believe

2    it contains contraband." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996).  If these conditions are

3    met, the police are permitted to search the vehicle "with nothing more." *Id*. There is no dispute that

4    the vehicle was readily mobile, so the propriety of the warrantless search hinges on whether the

5    officer had probable cause to believe that contraband or evidence of criminal activity was located

6    within the vehicle.

7            Probable cause to search exists when the known facts and circumstances are sufficient to

8    cause a reasonable person to conclude that contraband or evidence of a crime will be found." *United*

9    *States v. Ibarra*, 345 F.3d 711, 716 (9th Cir. 2003) (citation omitted); *see e.g., California v. Acevedo*,

10   500 U.S. 565, 569 (1991).  There must be a "'fair probability' that contraband or evidence is located

11   in a particular place." *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) (*quoting Illinois*

12   *v. Gates*, 462 U.S. 213, 246, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)).  The "fair probability"

13   inquiry is a "'commonsense, practical question'" that is based on the totality of the circumstances,

14   including reasonable inferences. *Id.* (*quoting United States v. Gourde,* 440 F.3d 1065, 1069 (9th Cir.

15   2006)).

16           Here, at the initial point of contact with Garcia, Officer Sutton observed a clear baggy

17   containing a crystalline substance.  Based on his experience and training, he immediately identified

18   the substance as a possible controlled substance–methamphetamine.[6]  Garcia does not dispute the

19   presence or location of the methamphetamine, but argues that the particles were so small that they were

20   impossible for Officer Sutton to ascertain that they were, in fact, methamphetamine. However, the

21   inability to immediately identify the substance as methamphetamine is not dispositive. "[I]t is settled

22   law that officers may "'draw on their own experience about cumulative information available to

23   them that might well elude an untrained person.'" *Hart v. Parks*, 450 F.3d 1059, 1067 (9th Cir.

24   2006) (*citing United States v. Hernandez*, 313 F.3d 1206, 1210 (9th Cir. 2002) (*quoting United*

25   *States v. Arvizu*, 534 U.S. 266, 273 (2002))).  The court finds that, a reasonable person with Officer

26   Sutton's experience and training would have concluded, as Officer Sutton did, that the vehicle

27

28           [6]  A later field test confirmed the substance was methamphetamine. *See supra.*, fn. 3.

1  contained contraband or evidence of criminal activity.  Thus, under the automobile exception to the

2  Fourth Amendment's general warrant requirement, the police were authorized to search the vehicle.

3  The evidence obtained as a result of the vehicle search is admissible.[7]

4  **2.  Miranda**

5       The obligation to administer *Miranda* warnings attaches once a person is subject to "custodial

6  interrogation."  *Miranda v. Arizona*, 384 U.S. 436, 465 (1966).  Custody turns on whether there is

7  a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

8  *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (*citing United States v.*

9  *Kim*, 292 F.3d 969, 973 (9th Cir. 2002)).  In addition to being in custody, the accused must also be

10  subject to interrogation.  *Rhode Island v. Innis*, 446 U.S. 291 300 (1980).  Not every question asked

11  in a custodial setting constitutes interrogation.  *United States v. Chen*, 439 F.3d 1037, 1040 (9th Cir.

12  2006) (*citing United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1982)).  Interrogation means

13  questioning or "its functional equivalent," including "words or actions on the part of the police (other

14  than those normally attendant to arrest and custody) that the police should know are reasonably likely

15  to elicit an incriminating response from the suspect."  *Innis*, 446 U.S. 291 at 301.  There is no dispute

16  that Garcia was in custody and subject to interrogation.  The dispute lies in (1) whether the *Miranda*

17  warnings were adequately given and (2) whether there was a knowing, intelligent, and voluntary

18  waiver of clearly given *Miranda* warnings.

19      **A.  *Miranda* Warnings**

20       The *Miranda* warnings  are prophylactic and are "not themselves rights protected by the

21  Constitution but [are] instead measures to insure that the right against compulsory self-incrimination

22  [is] protected."  *Michigan v. Tucker*, 417 U.S. 433, 444 (1974).  In *California v. Prysock*, 453 U.S.

23  355 (1981), the Supreme Court stated that "no talismanic incantation [is] required to satisfy" the

24  strictures of *Miranda*.  *Id.* at 359.  Owing to the fact that officers in the field may not always have

25  immediate access to printed *Miranda* warnings, it is not necessary that the warnings be given with

26  the precise words used in *Miranda*.  *See United States v. Mejia*, 559 F.3d 1113, 1117 (9th Cir. 2009)

27  

28      [7]  The court finds separately that, standing alone, the immediately recognizable drug contraband supplied the necessary probable cause to conduct the warrantless search.

1   (*citing Duckworth v. Eagan*, 492 U.S. 195, 203 (1989). The inquiry is whether the warnings

2   reasonably convey the substance required by *Miranda*. *Duckworth*, 492 U.S. at 203.

3          The threshold determination for resolution of the *Miranda* issue in this matter is whether

4   Garcia was given adequate warnings before he made incriminating statements. The record

5   establishes that before Officer Sutton began his search of Garcia's vehicle he requested the presence

6   of another unit. Shortly after the request was made, Officer Black, arrived on the scene. Once

7   Officer Black arrived, Garcia was removed from his vehicle and escorted to the front of Officer

8   Sutton's patrol car. Officer Black stayed with Garcia while Officer Sutton returned to Garcia's

9   vehicle to conduct a search. In addition to the methamphetamine, the search revealed a firearm and

10  spent shell casings. Upon discovering the firearm, Officer Sutton alerted Officer Black to the

11  presence of a firearm. After communicating the presence of the firearm, Officer Sutton returned to

12  Garcia who was positioned with his back to his vehicle near the front of Officer Sutton's patrol car.

13  Officer Sutton put Garcia in handcuffs and placed him under arrest.

14         At the evidentiary hearing, Officer Sutton testified that while placing Garcia under arrest that

15  he advised him of his *Miranda* rights. *See* Tr. of Proceedings (#21) at 24:19-25. Although Officer

16  Sutton had a LVMPD issued *Miranda* card on his person, he chose to recite them from memory. On

17  direct examination he testified that he told Garcia, "[y]ou have the right to remain silent. Anything

18  you say can and will be used against you in a court of law. You have the right to an attorney before

19  questioning. If you do not appoint an attorney, one will be appointed for you." *See* Tr. of

20  Proceedings (#21) at 27:4-8. He also testified that he asked Garcia if he understood his rights and

21  whether he would agree to answer some questions–to which Garcia allegedly replied yes.

22         Subsequent to Officer Sutton's testimony, the Government called Officer Black to the stand.

23  During the course of his direct examination, the following exchange took place:

24     **Question (by Government):** What happened while you were standing there with
       the defendant?

25

26     **Answer (by Officer Black):** Officer Sutton was searching the vehicle. He then
       came back to the suspect and put him in handcuffs.

27     **Q:** Okay. Before he came back to the relative area where you were, did Officer
       Sutton communicate with you in any way?

28

1    **A:** He did.

2    **Q:** And how did he do that?

3    **A:** He – I don't remember exactly what he did, but I remember him hinting to me there was a firearm in the vehicle.

4

    **Q:** Okay.

5

    **A:** I don't remember if he used a code or a hand signal, but – to give me a heads
6    up, basically.

7    **Q:** Okay.  So, what happened after he gave you that signal?  What did he do next?

8

    **A:** He [Officer Sutton] put handcuffs on him –

9

    **Q:** Okay.

10

    **A:**  – and took him into custody.

11

    **Q:** And then what did you do while he was –

12

    **A:** I just stayed with the suspect and Officer Sutton went back to the vehicle.

13

    **Q:** Okay.  So, the three of you were together and Officer Sutton put him in
14    handcuffs.

15    **A:** Yes.

16    **[Pause In The Proceedings]**

17    **Q:** So, the three of you were together, correct?

18    **A:** Yes.

19    **Q:** All right.  Did you hear Officer Sutton speak with the defendant

20    **A:** Yes.

21    **Q:** Did you hear him give any sort of Miranda warning or anything like that?

22    **A:** I did not hear that.

23    **Q:** But you did hear him speak to the defendant.

24    **A:** Yes.

25    *See* Tr. of Proceedings (#21) at 53:7-54:14.  This testimony directly contradicts Officer Sutton's

26    testimony.  Whereas Officer Sutton testified that he gave the *Miranda* warnings when he placed

27    Garcia under arrest, Officer Black testified that, despite being within earshot of the conversation and

28    hearing Officer Sutton speak to Garcia, he did not hear any *Miranda* warnings.  Despite the efforts

1    of Government's counsel to reconcile this glaring contradiction, the court finds that Officer Sutton's

2    testimony regarding the alleged *Miranda* warnings is not credible.

3         Officer Black's testimony, both in response to questions from counsel and from the court,

4    establishes that he was within five (5) feet of Officer Sutton and Garcia when the latter was placed

5    under arrest. Officer Sutton testified that he gave Garcia the *Miranda* warnings at the time of arrest.

6    Officer Black, standing within just a few feet and stating that he heard Officer Sutton speaking with

7    Garcia but did not hear the *Miranda* warnings. The court cannot conclude that the *Miranda*

8    warnings, if given, were sufficient to convey the substance of *Miranda* when a trained officer

9    standing within earshot and testifying that he overheard the conversation is unable to confirm the

10   substance or existence of the warnings. Moreover, Officer Sutton, during both direct and cross-

11   examination, was forced to recant or modify numerous prior statements further undermining his

12   credibility on the *Miranda* issue. Accordingly, because the court finds that the *Miranda* warnings

13   were never adequately conveyed, the statements made by Garcia subsequent to his arrest are

14   suppressed. Having determined the *Miranda* warnings were never adequately conveyed, the court

15   does not reach the issue of whether Garcia's alleged waiver was valid.

16                                    **RECOMMENDATION**

17        Based on the foregoing and good cause appearing therefore,

18        IT IS THE RECOMMENDATION of the undersigned Magistrate Judge that the

19   Defendant's Motion to Suppress (#13) be **GRANTED** as to the suppression of all statements made

20   after he was arrested.

21        IT IS FURTHER RECOMMENDED that Defendant's Motion to Suppress (#13) be

22   **DENIED** as to all other requests.

23                                       **NOTICE**

24        Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must**

25   **be in writing and filed with the Clerk of the Court on or before January 8, 2010.** The Supreme

26   Court has held that the courts of appeal may determine that an appeal has been waived due to the

27   failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This

28   circuit has also held that (1) failure to file objections within the specified time and (2) failure to

1   properly address and brief the objectionable issues waives the right to appeal the District Court's

2   order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d

3   1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

4          DATED this __5th__ day of January, 2010.

5

6

7

8   ROBERT J. JOHNSTON
    United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28